## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MISTY L. HIGHT,                          )        CASE NO. 5:14-CV-02591
                                         )
        Plaintiff,                       )
                                         )        MAGISTRATE JUDGE
        v.                               )        VECCHIARELLI
                                         )
CAROLYN W. COLVIN,                       )
        Acting Commissioner of Social    )
        Security,                        )        **MEMORANDUM OPINION AND**
                                         )        **ORDER**
                Defendant.               )

Plaintiff, Misty Hight ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a)  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On October 28, 2010, Plaintiff filed her application for SSI, alleging a disability

onset date of May 1, 1998.  (Transcript ("Tr.") 13.)  The claims were denied initially and

upon reconsideration, and Plaintiff requested a hearing before an administrative law

judge ("ALJ").  (*Id.*)  On April 10, 2013, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff

participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A

vocational expert ("VE") also participated and testified.  (*Id.*)  On May 16, 2013,  the ALJ

found Plaintiff not disabled.  (Tr. 10.)  On September 23, 2014, the Appeals Council

declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On November 25, 2014, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14, 15.)

Plaintiff asserts the following assignment of error: The ALJ erred in finding that Plaintiff did not meet Listing 12.05(B) and 12.05(C).

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in February 1988 and was 22-years-old on the date she filed her application.  (Tr. 25.)  She had a limited education and was able to communicate in English.  (*Id.*)  She had no past relevant work.  (*Id.*)

### B.    Medical Evidence

#### 1.    Medical and School Reports

Plaintiff received special education assistance through the developmental handicap program at Fairmount Elementary School and Crenshaw Middle School.  (Tr. 319.)  She was held back in the first grade.  (*Id.*)  In May 1996, Plaintiff had a full scale IQ score of 71.  (Tr. 365.)  Her verbal scale and performance scale scores were 88 and 59, respectively.  (*Id.*)

The following issues were noted at Plaintiff's January 15, 2003, eighth grade Individualized Education Program (IEP) assessment: "Although Misty displays good oral reading skills, she does experience difficulty with content related vocabulary and literal

2

and inferential comprehension." (Tr. 217.)  The IEP indicated that Plaintiff had difficulty with consistent topic maintenance throughout a story as well as the use of correct grammar and punctuation.  (*Id.*)  She also had difficulty with multiple digit multiplication and division as well as adding, subtracting, multiplying, and dividing fractions and decimals.  (*Id.*)

In March 2004, psychologist Richard VanVoorhis, D.Ed., performed a Wechsler Abbreviated Scale of Intelligence Test on Plaintiff.  (Tr. 322-323.)  Dr. VanVoorhis noted that Plaintiff received special education services since third grade.  (Tr. 321.)  Dr. VanVoorhis rated Plaintiff's verbal IQ at 65, her performance IQ at 67, and her full scale IQ at 64.  (Tr. 322.)  Plaintiff's scores were considered "well below average."  (*Id.*) Plaintiff demonstrated "significant weaknesses in the areas of cognitive ability, academic achievement, and adaptive behavior which adversely impact educational performance."  (Tr. 323.)  She needed to improve adaptive skills such as practicing how to mail a letter, taking care of herself when ill, staying organized with schoolwork and her belongings, performing minor household repairs, participating in hobbies, and improving her money skills.  (Tr. 322.)  Plaintiff was 16-years-old at the time of testing. (Tr. 323.)

Plaintiff's tenth grade IEP was reassessed in February 2006.  (Tr. 204.)  Plaintiff was "very successful" in her studies with adaptations and modifications and was said to work "very hard."  (*Id.*)  The IEP stated that Plaintiff was doing well with her academics and that she was "a very nice, conscientious student and spends a great deal of time doing her best work."  (*Id.*)  The IEP noted that Plaintiff would continue to benefit from

3

special education services.  (*Id.*)

Plaintiff attended regular counseling sessions and occasional psychiatric visits from January 2011 through January 2013.  Treatment notes from an early January 2011 counseling session state that Plaintiff presented a "depressed, anxious mood and blunted affect." (Tr. 415.)  Plaintiff reported that she had "significant symptoms of depression and emotional distress" and that she stayed in her room and kept to herself a lot.  (*Id.*)  A few weeks later, Plaintiff reported "increased depression and anxiety related to concerns about her mother's health."  (Tr. 417.)

Nurse Practitioner Kathleen O'Reilly conducted an initial psychiatric evaluation of Plaintiff on January 31, 2011.  (Tr. 395.)  Plaintiff was cooperative and had a congruent affect, but appeared disheveled and overweight and exhibited an average demeanor and avoidant eye contact.  (Tr. 399.)  Plaintiff rated her depression a 10 out of 10 and admitted to not wanting to live at times.  (*Id.*)  Ms. O'Reilly diagnosed mood disorder not otherwise specified (NOS); post-traumatic stress disorder (PTSD); and borderline intellectual functioning (BIF).  (Tr. 400-401.)  Ms. O'Reilly assigned Plaintiff a Global Assessment of Functioning (GAF) score of 46.[1]  (Tr. 401.)  Plaintiff was prescribed Prozac, an anti-depressant.  (*Id.*)

Weeks after being prescribed Prozac, Plaintiff reported that she only took the medication one time because she felt it caused nausea and headaches after she

---

[1]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

4

"pulled the capsule apart and took the Prozac directly."  (Tr. 426.)  Plaintiff was encouraged to take the medication as prescribed and give it time to maximize its effectiveness.  (*Id.*)

In March 2011, Plaintiff told Nurse Tonya Hamilton that she was taking her medication as prescribed and did not experience any adverse side effects.  (Tr. 429.) Plaintiff also reported that she was seeing a counselor, which was helping her.  (*Id.*) Nurse Hamilton observed that Plaintiff appeared well-groomed, exhibited an average demeanor, was cooperative, and had average eye contact and a congruent affect.  (*Id.*)

On April 7, 2011, Plaintiff told her counselor: "I've been really feeling down again and crying lately.  I think it is because of my dad.  He's been really yelling and we've been fighting a lot again and I think that's the main thing that has me down."  (Tr. 512.) Plaintiff also reported that she was babysitting for her brother's girlfriend's child "a lot." (Tr. 514.)  Plaintiff stated that her brother's girlfriend "gets overwhelmed and doesn't like to change diapers, so I do a lot for her kids."  (*Id.*)

Plaintiff exhibited a withdrawn demeanor and constricted affect at her April 18, 2011, appointment with Nurse O'Reilly.  (Tr. 404.)  Plaintiff reported that her father had become increasingly threatening to her mother.  (Tr. 403.)  Plaintiff's thought process was concrete and she had fair insight and judgment.  (Tr. 404.)

At a counseling session on May 12, 2011, Plaintiff reported that she received her temporary driver's license and that she was "practicing a little with [her] mom" and could not wait to get her license.  (Tr. 520.)  At another counseling session in late May 2011, Plaintiff reported that her father was fighting and yelling at her mother.  (Tr. 525.)  In June 2011, Plaintiff reported that she was "trying to walk away and go in [her] room

5

when [her] dad gets on [her] nerves."  (Tr. 530.)

Between July and September 2011, Plaintiff's mental status was unchanged. She appeared well-groomed; she was cooperative; she had average eye contact, an average intelligence estimate, and fair insight and judgment; and she exhibited a constricted affect.  (Tr. 536-546.)

A treatment note from July 21, 2011, indicated that Plaintiff continued to express feelings of sadness and frustration related to multiple familial stressors.  (Tr. 537.)

Plaintiff reported that she wanted to move away from her father but did not want to leave her mother behind.  (*Id.*)  Plaintiff told Nurse O'Reilly that she was occasionally paid by her brother for the "extensive babysitting she does for him," and that she would "ultimately like to receive SSI," obtain her driver's license, and move herself and her mother away from her father.  (Tr. 408.)  Plaintiff appeared well groomed, had a logical thought process, congruent affect, and fair insight and judgment, but she exhibited a withdrawn demeanor and a dysphoric mood with some anxious features.  (Tr. 409-410.)

On September 15, 2011, Plaintiff reported that "[i]t worried us that my brother's girlfriend is gonna have another baby when she's not takin care of the ones she has," and that she spent time on the computer and with her mother and sister to cope with stress.  (Tr. 544.) Plaintiff's intelligence was estimated as average.  (*Id.*)  In October 2011, Plaintiff appeared well groomed and cooperative, and presented a constricted affect and an anxious, dysthymic mood.  (Tr. 584.)  Plaintiff's intelligence was again rated as average.  (*Id.*)  Plaintiff reported that she was "stressed a lot about the babysitting.  My brother and his girlfriend like to go a lot and they drop the kids off with me and they don't even change the kids' diapers."  (*Id.*)

6

Throughout the end of 2011, Plaintiff continued to take her depression medication and had mild to moderate symptoms and presented a withdrawn and demanding demeanor.  (Tr. 579-583, 676-678.)  Nurse O'Reilly's findings were otherwise unremarkable.  (*Id.*)  In November 2011, Plaintiff reported, "I still get depressed, but it is not as bad, and does not last as long."  (Tr. 676.)

Plaintiff's early 2012 treatment notes document her continued reports of familial difficulties relating to her father and siblings.  (Tr. 650-652, 657-660, 667-671.)  At Plaintiff's February 2012 counseling session, Plaintiff appeared well groomed, was cooperative, and had an average demeanor, average eye contact, and fair logic and insight, but she exhibited a constricted affect, rapid speech, and some difficulty with attention and concentration.  (Tr. 657-658.)  In April 2012, Plaintiff reported ongoing difficulties with her father, but her mental status was identical to her February 2012 mental status.  (Tr. 650-651.)  In June 2012, Plaintiff continued to report familial difficulties, stating that she wished her brother and sister-in-law would do more for their children.  (Tr. 796.)

At an October 2012 psychiatric visit, Plaintiff's mental status was unremarkable, but treatment notes indicated that she was noncompliant with her visits and anti-depression medication.  (Tr. 754.)  Plaintiff told the nurse that she babysat for her brother every Friday night and spent her time watching TV, listening to music, and reading.  (*Id.*)  Plaintiff reported that she was close with her twin sister and had a strained relationship with her dad.  (*Id.*)

At a psychiatric visit with Nurse O'Reilly in January 2013, Plaintiff reported that she frequently babysat her brother's four children.  (Tr. 748.)  On examination, Plaintiff

7

presented a full affect and logical thought process, although her demeanor was withdrawn and she was in an anxious mood.  (Tr. 748-750.)  Plaintiff was diagnosed with mood disorder NOS and PTSD.  (Tr. 750.)

### 2.    Agency Reports

Consultative psychologist James Lyall, Ph.D., performed a psychological examination of Plaintiff in May 2011.  (Tr. 483-487.)  Plaintiff "was well oriented to time, date, place, and situation"; had an unremarkable memory; and was noted to potentially "have poor judgment" and "some insight into her need for mental health services."  (Tr. 485.)  Plaintiff reported that she dropped out of school in tenth grade and had a history of attention deficit hyperactivity disorder (ADHD) and a learning disability.  (Tr. 483.)  Plaintiff also related that she was physically and verbally abused by her father as a child and that she did not get along with other children in school because they teased her.  (Tr. 483-484.)  Plaintiff reported that she had some counseling when she was younger because of her father's abusive behavior, and that she had been going to Coleman Professional Services for counseling for the past three months and was taking Prozac.  (Tr. 484.)  She stated that she liked her counselor, occasionally socialized with her sister, had no friends, and was shy and fearful of being around others because they always teased her.  (Id.)  Dr. Lyall noted that Plaintiff's chief complaint was that she was unable to work because her "asthma acts up" and she experienced tingling in her hands.  (Id.)

On examination, Plaintiff appeared neat and clean, was cooperative but nervous, and spoke somewhat rapidly.  (Tr. 484-485.)  Dr. Lyall diagnosed Plaintiff with a cognitive disorder NOS and depressive disorder NOS and assigned a GAF score of

8

55.[2]  (Tr. 485.)  Dr. Lyall opined that Plaintiff "would have difficulty in work situations that involve close personal contact with others.  If she has an employer whom she feels is belittling her she would have greater difficulties as well.  She might be able to perform simple tasks with an understanding and accepting employer."  (Tr. 486.)  Dr. Lyall also administered the Wechsler Adult Intelligence Score Test and found that Plaintiff had a full scale IQ score of 71.  (Tr. 488.)

On May 12, 2011, state agency psychologist Mel Zwissler, Ph.D., reviewed Plaintiff's medical records and assessed her mental residual functional capacity (RFC).  (Tr. 62-66.)  Dr. Zwissler diagnosed Plaintiff with affective disorders and borderline intellectual functioning and found that she had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 62.)  He opined that Plaintiff had moderate difficulties in: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the public; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others.  (Tr. 64-66.)

---

[2]      A GAF score of 51-60 indicates moderate symptoms such as flat affect and circumstantial speech, or suggests moderate difficulty in social, occupational, or school functioning.

9

In December 2011, state agency psychologist Kristen Haskins, Psy.D., reviewed Plaintiff's medical records and assessed her mental RFC.  (Tr. 76-80.)  Dr. Haskins noted diagnoses of affective disorders and borderline intellectual functioning and found that Plaintiff had moderate restrictions in activities of daily living, social functioning, and maintaining concentration, persistence, and pace.  (Tr. 77, 78-80.)  Dr. Haskins opined that Plaintiff was moderately limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Tr. 78-80.)

C.     **Hearing Testimony**

   1.      **Plaintiff's Hearing Testimony**

Plaintiff testified that she had never worked because she did not like being around people.  (Tr. 36.)  She stated that she babysat her brother's children for about an hour once per month, but that she had not babysat for the past nine or ten months. (*Id.*)  Plaintiff testified that she did nothing during the day except sleep because she stayed up all night.  (Tr. 39.)  She did not do any household chores because she was

10

"depressed all the time" and stayed in her room because she did not want to be around people.  (Tr. 38.)  Plaintiff's mother went shopping for her.  (Tr. 40.)

Plaintiff attended school up to the tenth grade. (Tr. 41.)  She stated that she had no future plans to obtain her GED because she was terrible at math. (*Id.*)  She did not have trouble with reading or writing and was able to read books.  (Tr. 41-42.)  Plaintiff testified that her biggest problems were her anxiety, depression, blood pressure, difficulty with math, and the fact that she did not like to be around people.  (Tr. 43.)

### 2.     Vocational Expert's Hearing Testimony

Gene Burkhammer, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who would be capable of performing work at all exertional levels.  (Tr. 53.)  The individual would be limited to work involving simple, routine, and repetitive tasks and a work environment free of fast-paced production requirements and involving only simple, work-related decisions and routine workplace changes.  (*Id.*)  The individual could have occasional interaction with the public and frequent interaction with coworkers.  (*Id.*)  Her contact would be superficial, meaning no negotiation or confrontation with others.  (*Id.*)  The VE testified that the hypothetical individual would be capable of performing such jobs as an order puller, a dishwasher, and a housekeeping cleaner.  (Tr. 54.)

### III.     STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

12

404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since October 28, 2010, the application date.

2.   The claimant has the following severe impairment: Borderline Intellectual Functioning.

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, routine, and repetitive tasks.  The work environment must be free of fast-pace production requirements and must involve only simple work related decisions and routine work place changes.  The claimant can occasionally interact with the public and frequently with coworkers.  The claimant can have superficial contact, defined as no negotiation or confrontation with others.

5.   The claimant has no past relevant work.

6.   The claimant was born in February 1988 and was 22-years-old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.   The claimant has a limited education and is able to communicate in English.

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.  The claimant has not been under a disability, as defined in the Social Security Act, since October 28, 2010, the date the application was filed.

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignment of Error

Plaintiff argues that the ALJ erred in finding that she did not meet subsections

(B) and (C) of Listing 12.05.  Listing 12.05 sets forth the requirements for finding

disability resulting from "intellectual disability."  20 C.F.R. Pt. 404, Subpt. P, App. 1 §

12.05.  In its first paragraph, Listing 12.05 provides the diagnostic description of the

impairment:

> Intellectual disability refers to significantly subaverage general
> intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment
> before age 22.
>
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.

*Id*.  In other words, in order to satisfy the requirements of the Listing, an individual must,

first, demonstrate the onset of the deficits described in the diagnostic description prior

to age 22, and, second, satisfy the requirements of any one of the four subsections.

See *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 676 (6th Cir. 2009) (noting that

an IQ below 70 was not sufficient on its own to satisfy Listing 12.05, as the claimant

must "still satisfy the three-prong definition of mental retardation" and one of the

subsections).

An individual may satisfy the requirement of subsection (B) of Listing 12.05 by

demonstrating a "valid verbal, performance, or full scale IQ of 59 or less."  *Id*.  An

individual may satisfy the requirement of subsection (C) by demonstrating a "valid

verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental

impairment imposing an additional and significant work-related limitation of function."

*Id*.  Thus, subsection (C) sets forth two requirements: (1) an IQ requirement; and (2) a

significant limitation requirement.

15

### 1.    Listing 12.05(B)

In his hearing decision, the ALJ found that Plaintiff did not meet the paragraph B criteria of Listing 12.05, because she did not have a valid IQ score of 59 or less.  (Tr. 17.)  The ALJ explained:

> The record contains one examination that resulted in IQ scores of 59 or less (Exhibit 2F/173).  However, this score was not repeated in subsequent testing.  Examination of school records indicate that, unlike subsequent testing, the test-taker and the testing procedure is not documented in the record.  In light of subsequent testing, the claimant's educational performance, and treatment notes, which indicate apparent average intelligence-type functioning, the claimant's IQ score of 59, is not valid.

(Tr. 17-18.)  Plaintiff maintains that the ALJ erred in rejecting her IQ score of 59.

As the Commissioner notes in her Brief on the Merits, the ALJ has discretion to evaluate the validity of a claimant's IQ score.  *See Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 721 (6th Cir. 2012) ("Although there was some competing evidence indicating mental limitations, such as Claimant's qualifying IQ score of 59, the ALJ explicitly agreed with the experts that this score was an underestimate and noted her prior IQ score of 76. We defer to the ALJ's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'"), citing *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2011).  "[T]he mere fact of a qualifying IQ score does not require that the ALJ find mental retardation under Section 12.05B when substantial evidence supports the contrary conclusion or the claimant's allegations of her capabilities are deemed not credible." *Id.*, citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542-43 (6th Cir. 2007).

Here, substantial evidence in the record, as articulated by the ALJ in his decision,

supports the ALJ's decision to reject Plaintiff's IQ score of 59.  While the ALJ recognized that the record contains one examination that resulted in an IQ score of 59 or less, he reasonably concluded that it was not valid because it was not repeated in subsequent testing and was inconsistent with Plaintiff's "educational performance, and treatment notes, which indicate average intelligence-type functioning."  (Tr. 17-18.)  First, the ALJ questioned the validity of the IQ score because the individual who conducted Plaintiff's IQ testing and the procedure used was not documented in the record.  (Tr. 17.)  As the Commissioner notes, the record states only that an individual named "N. Peterson" conducted the test, but does not include the individual's full name or credentials or the protocols used to conduct the testing.  (Tr. 365.)

Furthermore, the ALJ noted that the record contains evidence of higher IQ scores obtained by Plaintiff.  (Tr. 17.)  In March 2004, school psychologist Dr. VanVoorhis rated Plaintiff's full scale IQ score at 63.  (Tr. 322-323.)  In May 2011, Dr. Lyall administered the Wechsler Adult Intelligence Score Test and found that Plaintiff had a full scale IQ score of 71.  (Tr. 21, 488.)  The ALJ notes that with regard to these subsequent tests, the test-taker and testing procedure were documented in the record.  (Tr. 17.)

Moreover, the ALJ explained that Plaintiff's IQ of 59 was unreliable in light of the fact that Plaintiff's educational performance and the treatment notes of record do not support a finding of intellectual disability, but rather indicate average functioning.  (Tr. 17-18.)  The record shows that Plaintiff was present in the general education classroom for all subjects except math; had an "abundance of missing assignments" due to inconsistent attendance; was recognized for being very hard-working, nice, and conscientious; and made some improvements before dropping out of high school.  (Tr. 19, 204, 217, 242, 347,

17

360, 484.)  Plaintiff's 2006-2007 IEP report indicated that Plaintiff was doing well with her academics; was working in all tenth grade level classes with adaptions and modifications; and was spending "a great deal of time doing her best work."  (Tr. 19, 204.)  Furthermore, in rejecting Plaintiff's IQ score of 59, the ALJ properly considered that Plaintiff's intelligence estimate was rated as average by her counselor and a mental health specialist on numerous occasions.  (Tr. 17, 19, 422, 505, 509, 513, 517, 21, 525, 529, 533, 536, 540, 544, 585, 596, 605, 609, 612, 616, 623, 627, 636, 640, 648, 651, 654, 658, 670, 673, 680, 684, 760, 764, 768, 772, 776, 780, 784, 788, 792, 800.)  Accordingly, substantial evidence supports the ALJ's decision to find Plaintiff's IQ score of 59 unreliable.  As Plaintiff does not have a valid IQ score of 59 or less, she does not satisfy the criteria of Listing 12.05(B).

### 2.    Listing 12.05(C)

Plaintiff argues that the ALJ erred in deciding that Plaintiff did not meet the "significant limitation" requirement of Paragraph C of Listing 12.05.  As discussed above, an individual may satisfy the requirement of subsection (C) by demonstrating a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  According to Plaintiff, the ALJ erred in finding that her "mood disorder does not cause additional limitations that are significant" for purposes of satisfying the criteria of Listing 12.05(C).  (Plaintiff's Brief ("Pl.'s Br.") 14.)

In finding that Plaintiff did not meet Listing 12.05(C), the ALJ explained that Plaintiff met the IQ requirement, but not the significant limitation requirement, of Paragraph C:

18

> [T]he "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The record contains valid IQ scores of 60 through 70 (Exhibits 2F/130-131 and 8F). However, none of the claimant's physical impairments are severe and do not cause additional significant limitation. With regard to the claimant's mental impairments, as noted in the treatment history, although the claimant was treated for mood disorder, her mood disorder does not cause additional limitations that are significant. Indeed, the claimant's treatment notes show that her complaints were focused on family and social issues. Therefore, the "paragraph C" criteria are not met.

(Tr. 18.) Plaintiff maintains that the ALJ's finding that Plaintiff's mood disorder does not cause additional significant limitations is not supported by substantial evidence. Plaintiff notes that state agency consultants Drs. Zwissler and Haskins both found Plaintiff's affective disorder to be her primary diagnosis. (Tr. 62, 76.) Plaintiff argues that the ALJ assigned "great weight" to Dr. Zwissler's opinion, but failed to address his finding that Plaintiff's affective disorder significantly limited her mental ability to perform basic work activities. Plaintiff also argues that "[i]n light of the 'great weight' provided to Dr. Zwissler's opinion, which appears to contain greater limitations than those found by the ALJ, the ALJ should have more clearly explained how the mental RFC finding was consistent with Dr. Zwissler's opinion or, in accordance with SSR 96-8p, the ALJ should have explained why he did not adopt these more severe limitations." (Pl.'s Br. 15.) For the following reasons, Plaintiff's arguments are not well taken.

Substantial evidence supports the ALJ's conclusion that Plaintiff's mood disorder did not cause additional significant limitations. As an initial matter, the ALJ did not wholly ignore Plaintiff's mood disorder; nor did the ALJ find that it had no impact on her abilities.

19

Rather, in determining Plaintiff's severe impairments at Step Two of the sequential evaluation process, the ALJ expressly acknowledged that Plaintiff was diagnosed with a mood disorder, but ultimately concluded that the disorder did not significantly limit Plaintiff's ability to perform basic work-related activities. (Tr. 15, 19.)  The ALJ explained that the Social Security Administration "is not a diagnosis driven agency and focuses on the effect of the impairment rather than the name.  Therefore, for purposes of disability determination [Plaintiff's mental] impairment diagnoses are considered to be the same as they all address the same limitations." (Tr. 19.)  Thus, the ALJ acknowledged that Plaintiff had a diagnosis of mood disorder, but explained that her condition did not cause significant limitations.  The ALJ discussed specific evidence from the record to support this conclusion, noting, for example, that Plaintiff's symptoms waxed and waned during treatment, and that her complaints appeared to be focused on her family life, as documented in almost every mental health treatment note.  (Tr. 20, 24.)  The ALJ also explained that Plaintiff's activities of daily living showed that she was not as limited as she alleged.  (Tr. 24.)  Most notably, treatment records show that Plaintiff engaged in "extensive babysitting."[3]  (*Id.*)

Furthermore, while both Drs. Zwissler and Haskins, like the ALJ, acknowledged that

---

[3]    The ALJ noted that Plaintiff gave inconsistent testimony regarding her childcare activities, which called into question the overall probative value of her statements.  (Tr. 25.)  During the hearing, Plaintiff testified that she had not babysat for nine or ten months and that when she had babysat, it was only once a month for an hour.  (*Id.*)  The ALJ found that testimony inconsistent with the treatment record, which contained numerous references of Plaintiff's babysitting activities, including complaints that her brother and/or his girlfriend took advantage of her with regard to extensive babysitting.  (*Id.*)

Plaintiff was diagnosed with a mood disorder, Plaintiff fails to explain how this fact supports a finding that her mood disorder caused a significant limitation. It is well established that the "mere diagnosis" of a condition "says nothing" about its severity, or its effect on a claimant's ability to perform work. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Indeed, neither Dr. Zwissler nor Dr. Haskins opined that Plaintiff's mood disorder significantly limited her mental abilities; they found that Plaintiff had only mild to moderate mental limitations, not marked limitations. (Tr. 62-66, 78-80.) The fact that Drs. Zwissler and Haskins' opinions note a primary diagnosis of affective disorder does not, alone, require a finding of significant limitation under Paragraph C of Listing 12.05 as a result of that disorder, nor does it require the ALJ to include limitations specifically related to that diagnosis in Plaintiff's RFC.

Finally, contrary to Plaintiff's assertion, the ALJ did not err in his evaluation of Dr. Zwissler's opinion. Dr. Zwissler opined that Plaintiff had moderate difficulties in: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the public; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. (Tr. 64-66.) The ALJ gave "great weight" to Dr. Zwissler's opinion because "he is an acceptable medical source and because his opinion is consistent with the claimant's IQ testing and mental health treatment notes which showed some deficiencies in the area of social interaction and

concentration, persistence or pace due to borderline intellectual functioning." (Tr. 23.) The ALJ further noted that Dr. Zwissler's opinion was consistent with Plaintiff's reported activities of daily living, which included childcare. (*Id.*)  Plaintiff summarily concludes, without explanation, that Dr. Zwissler's opinion "appears to contain greater limitations than those found by the ALJ." (Pl.'s Br. 15.)  While the ALJ did not find that Plaintiff's mood disorder significantly limited her, he did find, as Dr. Zwissler did, that her mental impairments limited her to some extent.  Consequently, the ALJ limited Plaintiff to performing simple, routine, repetitive tasks in a work environment free of fast-pace production requirements and involving only simple work-related decisions and routine workplace changes.  (Tr. 18.)  The ALJ further limited Plaintiff to only occasional interaction with the public and frequent interaction with coworkers, and noted that all contact must be superficial, meaning it may not involve negotiation or confrontation. (*Id.*)  Plaintiff fails to explain how Dr. Zwissler's opinion necessitates additional limitations beyond those included in the ALJ's RFC assessment.  Accordingly, Plaintiff has not shown that the ALJ erred in his evaluation of Dr. Zwissler's opinion.  For the foregoing reasons, Plaintiff's assignment of error does not present a basis for remand of her case.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 28, 2015